**Dr. Richard Weinblatt**
The Cop Doc LLC
309 Hunters Point Court
Longwood, FL 32779-2201
(407) 739-9089
richard@thecopdoc.com
www.TheCopDoc.com

**EXPERT'S REPORT**

September 30, 2011

Stephanie D. Ritchie, Esq.
Batson Nolan PLC
121 South Third Street
Clarksville, TN  37040                       RE:            Trina Williams Jones vs.
                                                            Christian County, KY/Robert
                                                            Schneider
                                                            In
                                                            United States District Court
                                                            Western District of Kentucky
                                                            Paducah Division
                                              Case No.:     5:09-CV-00198

Dear Ms. Ritchie:

Pursuant to our conversations and your request that I examine available documents and materials in relation to the Trina Williams Jones case, I am presenting to you this report (the fee agreement, resume and list of cases consulted has been provided).  This report is based on my training, education, and experience as a law enforcement officer, police chief, police academy instructor and director, writer, trainer, and educator.

My examination of this matter stems from events that transpired on or about November 21, 2008 involving Trina Jones and her now 17-year-old/then 15-year-old son (according to Trina Jones deposition, p. 5), Austin Dale Jones, and Christian County, KY, Sheriff's Office Deputy Sheriff Robert A. Schneider.

I understand that the two criminal trials of Ms. Jones on the Kentucky Revised Statute charges of Menacing (508.050) and Resisting Arrest (520.090) arising from this incident resulted in a hung jury and an acquittal.

According to the statute, the elements of Menacing (508.050) in Kentucky are:

> (1) A person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury.
> (2) Menacing is a Class B misdemeanor

According to the statute, the elements of Resisting Arrest (520.090) in Kentucky are:

> (1) A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by:
>   (a) Using or threatening to use physical force or violence against the peace officer or another; or
>   (b) Using any other means creating a substantial risk of causing physical injury to the peace officer or another.
> (2) Resisting arrest is a Class A misdemeanor.

In addition to the Kentucky Revised Statutes, I have examined the following documents that you provided in order to facilitate the preparation of this report:

VHS video cassette of the criminal trial from 5/29/09 of Trina Jones
Christian County Sheriff's Department Policy and Procedure Guidelines
Hopkinsville, KY, Police Department Personnel file for Cpl. Robert Schneider contents
Christian County, KY, Sheriff's Office Personnel file for Dep. Robert Schneider contents
Deposition transcript of Trina Jones from March 30, 2011
Complaint of Trina Williams Jones

## Review of Events

### Undisputed Events

The following version of events appeared to be agreed upon by all parties involved. Based on the deposition, trial tape, and complaint, plaintiff Trina Jones was driving in her vehicle when she detected the odor of an alcoholic beverage emanating from her then 15-year-old son, Austin Dale Jones. After some discussion, Austin admitted to his mother that he had consumed alcohol and was repeatedly apologetic.

After arriving at their home within the geographic jurisdiction of Christian County, KY, Ms. Jones attempted to have her son go to bed. The conversation between Ms. Jones and Austin continued during which time he was "acting comical" and apologized repeatedly.

After not being successful in that endeavor, Ms. Jones stated that she was going to "call someone." Her son apparently believed she meant law enforcement, so he called the 911 call center himself. The 911 operator called the residence back and Ms. Jones stated all was fine and asked that law enforcement not respond to the residence. (9:49 tape)

On duty uniformed deputy sheriffs with the Christian County Sheriff's Office were directed by dispatchers to respond in marked patrol units to the home to make sure all was well. Deputy

Robert Schneider was the primary response deputy backed up by Captain Timothy Cooksey and Sergeant Timothy Wallace. Riding with Capt. Cooksey in civilian clothes (as part of her regular weekly ride-along routine) was Capt. Cooksey's wife, Christian County Sheriff's Office deputy-bailiff Tracey Cooksey. (10:08 tape).

According to the parties' statements in the video tape and Ms. Jones' deposition, Deputy Schneider pulled in the driveway for the residence and proceeded to the residence for Ms. Jones' relative. That person, the father-in-law, directed him back to the Jones residence.

During the same timeframe, a highly intoxicated Austin Jones, clad only in boxer shorts with nothing in his hands, left the residence via the back door. Trina Jones, clad only in house clothes and also with nothing in her hands, also exited the house in pursuit of her son.

Deputy Schneider in the trial testimony with defense counsel stated that he "pushed her fairly hard." She apparently went far enough away from Deputy Schneider that he "wasn't right there where she was at when she fell back on her bottom." (10:22 tape) He also stated that Trina Jones "did not verbally threaten." them (10:34 tape)

Deputy Tracey Cooksey, who stayed in Capt. Cooksey's car, stated that she was reading through most of the call for police service and was unaware of most of the events that transpired.

All agreed that Trina Jones was physically forced back in some manner by Deputy Schneider.

According to the testimony in the trial tape and the deposition, it was at this point that versions of the events that transpired begin to diverge.

**Disputed Events**

The points of contention among the parties are as follows:

1) Trina Jones stated that she could see the lights of the cruisers from her kitchen and thus knew that law enforcement was there and went outside to check on her son who she "knew was going to jail." Deputy Schneider stated that the lights were not activated, which would have activated his in car camera system automatically. He did testify that he manually flipped the camera activation switch on his belt, but that the system did not worked properly despite "three or four" attempts by the Sheriff's Office's mechanic/deputy to fix it.

   Sgt. Wallace, veteran of the Kentucky State Police prior to his service with the Christian County Sheriff's Office, testified that he has worked 20 years without a camera and tends to forget to activate the camera in his unit. Sgt. Wallace also could not recall whether the lights were on.

2) Deputy Schneider contended that he had warned Austin to stop and only deployed his Taser (one probe in the chest and the other in the side/stomach area) when the 15-year-old kept advancing on him. Deputy Schneider also stated that he fired the cartridge and

that young Mr. Jones went to the ground. He said he ignored his commands to comply and started to get back up. He said that he pulled the trigger to deliver another five second cycle of the Taser through the still attached probes. It was then that he said Mr. Jones complied and rolled over to be handcuffed.

Ms. Jones and Austin stated that Deputy Schneider deployed the Taser on the young man immediately upon his exiting the residence. (11:42 tape) She stated that Deputy Schneider was yelling loudly and that she had to yell loudly to be heard over Deputy Schneider. (11:44 tape) She further said that Deputy Schneider "Tasered" Austin three more times through the still attached probes with a fourth application delivered via a drive stun to his back. (11:45 tape)

3) Deputy Schneider and Capt. Cooksey both testified initially that they were not concerned with most of what Ms. Jones was saying. Later they were able to confirm to defense counsel, Mr. Ritchie, that no threat was articulated verbally by Ms. Jones. Ms. Jones' language consisted of communicating that Austin was 15, a minor, and not to hurt him. At 11:06 of the trial, St. Wallace described Ms. Jones "as no direct threat."

4) As for verbal tone and physical proximity, Deputy Schneider, Ms. Jones, and Austin had similar statements that both Deputy Schneider and Ms. Jones were yelling. Deputy Schneider said that Ms. Jones was right behind him and that he felt threatened by her. Capt. Cooksey testified that Ms. Jones was "right on his back," but under cross, conceded that she was not physically on his back. Rather, she was actually further back. (10:46 tape).

5) Deputy Schneider testified that put his hand up and, using his palm, pushed Ms. Jones back from him. Ms. Jones described it as a lunge upward and more than an arm's length away. She also said it was quite a bit of force and that she landed on her wrist resulting in it breaking.

6) Deputy Schneider and Capt. Cooksey stated that Ms. Jones fell on her bottom. Ms. Jones said that she landed on her wrist beneath her bottom. (11:45 tape)

7) Capt. Cooksey said that Ms. Jones broke from him and Sgt. Wallace when Deputy Schneider said to arrest her. Ms. Jones said that she was pulling from Capt. Cooksey as her wrist was broken and he was hurting her. She did admit that she "freaked" at the prospect of being arrested. Sgt. Wallace at 11:06 of the trial tape stated that a handcuffed broken wrist is painful and would make some people upset.

### Expert's Opinions

1) **It was consistent with commonly accepted police standards and practices to respond to the 911 call for police service.**

All parties agree that Austin Jones made the initial 911 call which brought the Christian County Sheriff's Office into the situation. While Ms. Jones contends that law enforcement should not have responded when she advised 911 it was not necessary for them to do so, that would be contrary to the agency's mandate to provide for the safety of the people within Christian County, KY. As stated by Capt. Cooksey (at 10:40 on the tape), they had "to make sure everyone was fine at the 911 call."

Law enforcement agencies have an obligation to conduct a thorough investigation of any 911 call for police service to make sure that a telephonically received assurance that all is well is not given under duress from an as yet unknown assailant forcing that communication. The deputies were well within the scope of their duties to respond to a private residence to conduct that lawful investigation.

> 2) **It was not consistent with commonly accepted police standards and practices to use a Taser multiple times against Austin Jones and a sternum palm heel strike on Tina Jones when no articulable threat of violence is present.**

As a former law enforcement officer, I would never begrudge police officers, deputy sheriffs, and state troopers the lawful right to defend themselves or others against imminent physical harm, but no articulation for such action was presented to me in this case.

According to Ms. Jones and her then 15-year-old son Austin, Austin was Tasered as soon as he exited the rear of the residence. Trina Jones was struck in the chest by a sternum palm heel strike with force enough to drive her back onto her wrist and bottom resulting in bone breakage.

I was not provided any documentation such as normally expected and departmentally mandated Incident Reports or Use of Force Reports written by the deputy or his supervising sergeant and captain on the scene. Nor were there written statements from Austin Jones, Trina Jones, or Tracey Cooksey. Video camera tapes were not provided as evidence to support Deputy Schneider's assertions.

Deputy Schneider did not provide the justification that reasonable law enforcement officers would look for that would justify the need to deploy the Taser twice (according to his account), let alone four times (according to Ms. Jones).

Under Kentucky statute KRS 446.010 (24), Sheriffs (and presumably Deputy Sheriffs operating under the elected Sheriff's authority) are defined as "peace officers" and, as such, they are to use the power of persuasion to de-escalate situations. This concept is underscored in the Christian County Sheriff's Office's Policy #9:

> "IX. Procedures for Application of Non-Deadly Force
> A.   Verbal Persuasion: An officer should use verbal persuasion whenever possible. The practice of courtesy in public contacts encourages understanding and cooperation; lack of courtesy arouses resentment, and often physical resistance." (9-5)

It is my opinion that no evidence was presented, written reports or otherwise, that show that calm verbal persuasion was used in this situation. Rather, the testimonial evidence offered by Deputy Schneider, Trina Jones, and the others in the trial tape I viewed details a chaotic scene instigated by a "yelling" Deputy Schneider. As was portended in IX. A. above, yelling can lead to "resentment."

As the professional on the scene, the onus is on Deputy Schneider to take the high road and control his emotions even in the face of drunk or emotional people. That is what law enforcement does. We deal with people at their most volatile moments and it is incumbent on us to have the even temperament to deescalate, not escalate, situations.

Using the agency's Use of Force Policy #9, definition of reasonable force, I am unable to justify his rapid escalation on a minor who is described as stumbling drunk, clad only in boxers, with nothing in his hands. As written in Policy #9:

> "Reasonable Force: The minimum amount of force required to overcome the use or imminently threatened use of force against the officer or other person, which, based on facts or circumstances the officers knows or should know, would cause an ordinary prudent person to act or think in a similar manner." (9-3)

As for Trina Jones, I am hard pressed to see the justification for a sternum palm heel strike that evidentially produced enough force to have her fall hard on the ground with sufficient force to break bones and cause serious injury to a member of her body.

Per the department's own definition of serious injury under Use of Force Policy #9, III. Definitions on 9-2:

> "Serious Physical Injury: Any injury which created a substantial risk of death, or which causes serious and prolonged impairment of health of prolonged loss or impairment of the function of any bodily member or organ."

A palm heel strike to that area of the chest is a serious tactical move that should made only when the facts and circumstances warrant it. Deputy Schneider was not justified in doing such a strike which can be deadly blow.

Again, neither of the law enforcers on the scene seemed to view Trina Jones as enough of a threat to note what she was saying. They all did concede in testimony that she did not threaten the deputies. At 10:43 on the trial tape, Capt. Cooksey describes Ms. Jones dismissively as "just being very verbal." He further said that he didn't "hear any threats" (10:50 tape) and he had "no fear of immediate injury" from Ms. Jones. (10:51 tape) Sgt. Wallace stated that Ms. Jones "was no direct threat." (11:06 tape)

Capt. Cooksey himself apparently felt that Trina was not a threat that needed to remain in handcuffs. He testified that he removed the handcuffs. Given the nature of the force used, the act of unhandcuffing Ms. Jones was contradictory.

Per commonly accepted police practices, any prisoner that was enough of a threat to warrant a heel palm strike to the sternum, even in a calmed down state, would not be trusted to remain calm or safe enough to remove the handcuffs.

Even the agency's own policy disallows such an event. As noted at 8-6,

> "2. Handcuffed prisoners
> Unless it is necessary to remove the handcuffs in order for the prisoner to receive medical treatment, the handcuffs or restraints shall remain."

I also find it troubling that, despite all of the deputies on the scene being aware of her injury, no request was made of dispatch to send out emergency medical service personnel to the scene. According to Trina Jones, it was two hours before she was taken to a hospital. (11:49 tape) Such a delay is contrary to commonly accepted police practices. Emergency medical personnel should have been called immediately to the scene to treat and document the injury.

3) **It is not consistent with commonly accepted police standards and practices to not thoroughly investigate and document a call for police service and use of force.**

Contrary to police practices, none of the four on-duty or one off-duty deputy sheriffs appeared to have done a thorough investigation or documentation of the call for police service involving Trina Jones and Austin Jones. Nor was any investigation or documentation completed for the use of force involving Trina Jones and Austin Jones. This is even more troubling as two of whom were ranking members as sergeant and captain of the agency.

During the trial testimony, the disarray of the home is alluded to as being the scene of a domestic between mother and son. Testimony was offered of papers on the floor of the kitchen and a hole in the wall. No testimony was offered, nor were written statements taken from Ms. Jones or Mr. Jones, nor were any reports produced, nor were any pictures taken of the hole in the wall, or evidence collected, that would back up the vague notion of an assumed domestic incident.

As related by Sgt. Wallace in his trial testimony, they assumed that there was a disturbance in the house. No interviews or investigation took place and no report was composed. (11:08 tape)

Force was clearly used on Trina Jones by Deputy Schneider. That is not in dispute by any of the parties involved. In violation of commonly accepted police practices, and the agency's own policies, that use of force was not justified or documented. Nor was the use of force articulation and documentation apparently subject to any supervisory review.

No reports were presented to me. During the trial testimony, the only documentation that I saw referenced was the Kentucky citation with the charges. The officers' testimony was vague and they often couldn't remember specifics.

None of the officers asked to use reports to refresh their memory as is common practice in courtroom testimony. Nor had they apparently looked reports up prior to their testimony, again for the purposes of refreshing their memory.

Under Use of Force Policy #9, the agency spells out the requirement for physical use of force to be documented as follows:

> "XI. Reporting Use of Force
> A. 1. Officers shall submit a Use of Force Report as a result of any event when force is used." (9-8)
> B. "General Provisions: Use of Force Report
> 1. Use of Force Report shall contain, at a minimum, the following information:
> a. The circumstances causing the officer to resort to physical force.
> b. The type of force used.
> c. Description of deadly or non-deadly weapons used.
> d. Any other circumstances that pertain to the use of force and/or assist in explaining the event." (9-8)
>
> XIII. Administrative Review
> A. All reports shall be reviewed by the Sheriff. In any case… use of deadly or non-deadly force by an officer, the Sheriff shall seek to determine if the officer's conduct was proper or improper." (9-9, 9-10)

No evidence was presented to me to indicate that the Sheriff reviewed reports from Deputy Schneider, Sgt. Wallace, and Capt. Cooksey. It would be common practice for a higher ranking individual than Capt. Cooksey to do a review (such as the Chief Deputy) with findings and recommendations forwarded in writing to the Sheriff for final written determination. That did not happen here and the entire chain of command appears to be in violation of its own policy.

Trina Jones' acquittal on both criminal charges (Menacing and Resisting Arrest) is telling. While it is true that jurors under their instructions deal in the standard of beyond a reasonable doubt and law enforcers only have to rise to the lesser standard of probable cause, I do not believe that Deputy Schneider was able to articulate the elements (as detailed above from Kentucky Revised Statute) based on the fact pattern in sufficient manner to warrant the arrest. His response was an over-reaction and his probable cause appeared to be manufactured by his volatile temperament in the situation.

As for the Taser incident involving Austin Jones, both Scottsdale, AZ-based Taser International (the company that produces and provides training on Taser products) and the Christian County Sheriff's Office call for the thorough report documentation and evidence collection of any use of the Taser. Under the department's Use of Force Policy and Procedure Supplement F/Advanced Taser:

> "II. Procedures

> A. Every discharge, to include demonstration, training, and/or accidental discharge will be documented and submitted to the Training Officer for proper record maintenance."

The policy further goes on to state:

> "…a detailed Incident Report must be written explaining the subject's actions which led to the application of the Advanced Taser being necessary, the results of this application, and any after-care provided. In addition to the Incident Report, the user will complete the Supervisory Taser Usage Report (STUR). The STUR will be attached to the Incident Report and submitted to the Chief Deputy, the Training Officer, and a copy placed in the subject's file."

> J. Reports: Immediately following any deployment of the Advanced Taser, a detailed Incident Report shall be completed, explaining the actions which made the use of the Advanced Taser necessary. This report should also include any post application treatment and first aid measures taken. In addition to the Incident Report, the deploying deputy shall complete a Supervisory TASER Usage Report. A copy of these reports will be placed in the subject's file. A copy will also be submitted to the Chief Deputy and Training Officer.

> K. The Air Cartridge(s) used shall be placed into evidence and submitted to the Chief Deputy, along with his/her copy of the Incident Report.

> Several of the AFIDs should be collected from the scene and placed into the evidence bag/envelope."

Clearly, none of these protocols were followed. The failure to follow procedures appears to be part of the agency's custom and practice since a sergeant and captain were on scene. As stated before in this report, it is my opinion that the chain of command up to the Sheriff has failed to produce and review documentation.

Per Christian County Sheriff's Office Allocation and Distribution of Personnel Policy #2, the agency does in fact operate under a chain of command.

### 4) It is not consistent with commonly accepted police standards and practices to utilize equipment after it has been discovered that it does not function properly.

In his video-taped court testimony, Deputy Schneider stated that he had not activated his emergency lights and thus had to use the switch on his belt to manually activate the in-car video camera system.

Sgt. Wallace testified that he had forgotten to activate the system and did not appear to grasp the importance of using the camera. His contention that the activity was occurring on the grass off camera range denies the importance of the audio portion of the tape within a modern law enforcement context. Sgt. Wallace's attitude towards the use of the camera, and the

departmental policy that supports its use, is concerning as he is a supervisor on the scene and helps to set the tone for the agency.

Using such a system is prudent for evidentiary purposes for any future criminal proceedings or even civil matters. As noted in the departmental policy:

> "Mobile Video Systems Policy 11
> I.      Policy. Officer safety and evidence collection is of paramount concern to the Christian County Sheriff's Department. In order to provide enhanced safety and evidence collection, some units are being equipped with mobile video systems (MVS)." (11-2)

Deputy Schneider testified that he tried to turn on the system but was unaware that it was not functioning due to the tumult at the scene. It is standard practice in law enforcement to test all of your equipment at the beginning of the shift. That includes, but is not limited to your lights, sirens, Taser (spark test), radio, and in-car video system. Even the agency policy (delineated below under I.A.1.) calls for such a test to be done to ensure it is in working order.

Deputy Schneider also said that he had worked with another deputy in the department three or four times to fix the system to no avail. The system should have been removed and sent to the manufacturer as it was shown to be unreliable. The handling of the camera situation was not in keeping with the agency's policy.

Both issues are addressed in the agency's own policy:

> Property Management Policy #10
> III. Procedure Property Equipment and Uniform
>     A.    Employees of the department will be responsible for the proper care and use of department property and equipment assigned to or used by them and will promptly report to their supervisor any loss, damage, destruction or defect therein." (10-2)
>
> I.    Procedures.
>     A.    Field Use
>         1.    Test the MVS before each shift to ensure it is working properly. Reset the date and time if inaccurate. If any component of the system is not functioning properly, ensure that the supervisor knows that repair is needed and to get the unit shipped off for repair at the manufacturer." (11-2)
>
>     B.    Administration
>         d. The repair of the MVS, will be done by the Manufacturer or their designee." (11-4)

In my opinion, the video camera issue is another example of an agency wide failure to follow protocol.

5) **It was not consistent with commonly accepted police standards and practices to hire and retain a law enforcement officer who demonstrates instability and a violent temper.**

Most troubling of all is the employment of, retention of, and circumstances surrounding Deputy Schneider by the Christian County Sheriff's Office. According to materials I have gleaned from his personnel files from the Hopkinsville Police Department and the Christian County Sheriff's Office, as well as his conduct in this incident, he presents as a man who is not qualified in temperament to be in the position of a law enforcement officer.

Law enforcers in our society are entrusted with an enormous amount of power and responsibility. Unlike the President of the United States, they can (and do so usually with proper and lawful justification) take someone's life in an instant, impair their freedom of movement, or cause physical harm.

I find the letter of February 3, 2011 on Christian County Sheriff's Office official letterhead concerning Deputy Schneider particularly troubling. Written ostensibly by a ranking member of the agency with enough authority to compose it and enter into Deputy Schneider's personnel file, the document is very telling in its contents. Given its import, I have reproduced it here in its entirety:

> "Deputy Schneider has shown a consistent pattern of abuse, aggressiveness, and suicidal tendencies during his employment with the Christian County Sheriff's Department. He has, on several occasions, requested time off under the category of "stress leave", due to his self-admitted inability to respond rationally to confrontations, and therefore needed time off.
>
> Deputy Schneider currently has three pending lawsuits, all related to alleged excessive use of force. More recently, he has been served with an Emergency Protective Order taken out by his spouse, describing irrational behavior and threats to himself and others. The petitioner of this order describes this behavior as being recurrent over the past few years. During these alleged confrontations, Deputy Schneider has admittedly threatened to harm himself by putting his department issued service weapon to his head more than once, and going so far as writing instructions to his family on what to do with him in the event of his death." (page 000323)

The appalling lack of documentation on the part of the agency, especially when this letter evidences that a long standing problem was known, is very troubling. For example, I saw no evidence in the file of Deputy Schneider being cleared by a properly trained police psychologist or psychiatrist following each of the aforementioned stress leaves.

The emergency protection order from his wife also paints a picture of a troubled man that clearly does not belong among the ranks of professional law enforcers. The fact pattern as presented contains apparent violations of the law with clear elements that would give a responding officer

probable cause to do a thorough domestic violence and involuntary mental evaluation commitment investigation.

Additionally, I did not see any evidence of a background investigation or a psychological examination being done by the Christian County Sheriff's Office when Rob Schneider came to the agency from the Hopkinsville, KY, Police Department. It is an accepted police practice to do so regardless of where the applicant is coming from. Not doing so exposes the citizens of Christian County to a potential problem and is negligent hiring. Deputy Schneider is a prime example of why a thorough investigation and psychological should be done prior to hiring from another law enforcement agency.

While perusing the file, I did not see any evidence that the Christian County Policies and Procedures manual was signed for by Deputy Schneider. As is customary, newly employed law enforcement officers sign a paper that indicates that they have received read, and agreed to abide by the departmental policy. It appears that the Sheriff and his staff do not subscribe to that procedure therefore telegraphing the apparent policy disregard that occurred regarding Trina Jones and Austin Jones.

## Conclusion

In conclusion, as a former police chief, ex-police academy director and instructor, and past criminal justice professor who has written, spoken, and taught extensively on law enforcement practices, it is my opinion that Deputy Schneider did not properly discharge his duties at this call for police service, nor did he complete the documentation of this incident in an acceptable manner. Further, I believe that Deputy Schneider did not operate within the high standards commonly and reasonably expected of law enforcement professionals in the performance of official duties.

My opinion of the sub-standard law enforcement professionalism exhibited here is particularly applicable given the fact that Deputy Schneider is a 13-year law enforcement veteran. Additionally, as indicated in his personnel file, he has undergone quite a bit of training including hostage negotiation and domestic violence. The very nature of that training involves talking to people and de-escalating volatile personalities and situations.

As for Sgt. Wallace, Capt. Cooksey, and the command staff of the Christian County Sheriff's Office, it is my professional opinion that their hiring, apparent ongoing employment, and failure to supervise and document the actions, on the night in question as well as in the long term, of Deputy Schneider is shameful and a disservice to the residents of Christian County. They failed to adhere to the very policies, canons, and ethics that govern their and their employees' conduct.

The apparent disregard for the agency's policies on November 21, 2008 by Deputy Schneider, as well as Sgt. Wallace and Capt. Cooksey, is problematic. Multiple violations of the agency's own policies were admitted to in the trial testimony by the officers (such as proper investigation, use of force documentation, video camera usage, handcuffing, and use of force) and they did not seem to be concerned about that in the least. It seems to reveal a corporate culture in the

Sheriff's Office that is out of step with modern law enforcement practices where law enforcers follow rules and laws.

My professional opinion on this case is based on the information shared with me to this date. I reserve the right to provide additional analysis based on reports, documents, and other information that may be provided to me at a later date. If I may be of any further service, please do not hesitate to let me know.

Sincerely,

Dr. Richard Weinblatt
Principal Consultant
The Cop Doc LLC